STEPHEN RUG MILLS v. UNITED STATES

No. 5863.—Invoices dated Courtrai, Belgium, July 28, 1938, etc.
Entered at New York, N. Y., August 11, 1938, etc.
Entry No. 715542, etc.

(Decided May 3, 1943)

*Benjamin A. Levett* (*Meyer Ohlbaum, J. Stuart Tompkins,* and *Allerton deC. Tompkins* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Samuel D. Spector,* special attorney), for the defendant.

KINCHELOE, Judge: These appeals for reappraisement involve the dutiable value of certain rugs imported from Belgium by the Stephen Rug Mills, of New York, from five different manufacturers between August 1938 and November of the same year; namely, De Jaegher & Fils, Manufacture de Tapis Orienta S. A., Matthys Freres, Boillot & Ameloot, and MV. Algemeene Fluweelweverij. They were entered at the invoiced prices which were advanced by the appraiser to what he considered to be the foreign value of such or similar rugs at the time of exportation, plus 2½ per centum to cover a tax placed upon sales for home consumption.

The plaintiff produced no testimony as to foreign value, but simply contends that no such or similar merchandise was at the time of exportation of the merchandise to this country freely offered for sale

for home consumption, and that therefore the proper basis for appraisement is the export values, as invoiced. As to the 2½ per centum consumption tax added by the appraiser, it is conceded by Government counsel that this tax does not apply to export value.

The rugs in question are all composed of cotton and jute, and were all invoiced in Belgian francs per square meter, which was also the basis of the appraisement.

Two witnesses were called by the importer in support of its entered values. The first was James L. Marcus, head of plaintiff's import division. He testified that he ordered the rugs in question; that he had been in the business of handling rugs such as these since 1926, and been connected with the plaintiff since 1935; that his duties during the period of these importations was the purchasing, styling, and supervising the manufacture of the rugs in question; that he spent at least 6 months of each year in Belgium, visiting the factories, obtaining quotations from them, placing orders, supervising the merchandise in process, and checking it for color, quality, and pick; that he frequently visited the Belgian wholesale and retail stores to acquaint himself with the type of rugs they were selling, and to make comparisons between the rugs sold in the home market and the rugs purchased by him for export (R. 12, 13). The witness stated further that he made investigations of the materials from which the rugs were manufactured, and, in order to buy advantageously, kept a very close record of the fluctuations in the primary raw material markets for cotton and jute, and that he kept himself thoroughly posted with the prices of these materials (R. 15, 16); that in addition to handling the rugs in the stores of Antwerp and Brussels, which are the principal wholesale markets of Belgium, he frequently purchased reference samples for his office, which he kept for physical comparison with his goods. He dissected, weighed, and analyzed them to determine the percentage of jute and cotton contained in the various qualities, and would also have the cotton analyzed by standards to determine the amount of fine long-staple cotton and Indian cotton contained in them (R.17). He did this analyzing with the rugs he bought and the ones he purchased in the home market as reference samples, and found that while the rugs sold in the Belgian home market were similar in construction and material to those he bought for export, those sold in the Belgian market were superior in quality; that he purchased this type of rugs by weight per square meter at a definite basic price for each grade, but an examination would reveal that the Belgian rugs, supposedly of the same weight and quality as those he bought for export, were actually superior for the reason that they contained more cotton and less jute, and the grade of cotton would be finer than in his (R. 17, 18). The witness further stated that the imported rugs were all made to order of certain weights, but with

certain percentages of jute and cotton to be employed, and that he specified the type of cotton, and very often even indicated the spinner from whom the cotton was to be purchased, as "we worked with the spinners to produce certain blends of cotton in order to arrive at cotton that would look satisfactory, and yet be satisfactory in price as to current cottons." That he worked with about 20 manufacturers along these lines; that he found the rugs sold in the Belgian market contained a higher grade of cotton than those sold for export; that in the Belgian market the consumers wanted rugs that would give long wear. That the wear was a very important factor in their purchases, whereas in the domestic market here in the United States low price was of paramount importance, as people used to purchase these rugs and use them for a relatively short time (R. 19, 20). Also that there was a difference in the grade of the cotton yarn; that in the Belgian market they were made of finer long staple cotton that does not acquire the dirt as easily as the lower grades, and therefore the rugs would remain cleaner and last longer and would not have to be cleaned so often. Further, that there was less jute and more cotton in the rugs for home consumption; that the jute was the backing material, and the cotton formed the pile, and the rug would last longer when made of a greater proportion of cotton and less jute.

The witness stated further there was also a difference in construction in the rugs in the home market and those for export; that the rugs manufactured for his concern did not have as many tufts of cotton to the square inch as the rugs in the home market, and to make up for the lack of weight in the pile they used more jute in the back, and that, as jute was a lower priced yarn than cotton, they could arrive at a lower price per meter for fabrics weighing the same as those in the Belgian market (R. 20, 21). That rugs of the character of the imported rugs were not salable in the Belgian market in the ordinary course of trade, for the reason that they were inferior in quality and wearing qualities; that there was a basic price for the goods that he shipped to this country, because before placing contracts he would obtain quotations for the same weight and construction from as many as 15 to 20 different manufacturers, and the price would invariably be the same; that he placed several hundred contracts during the year, and before placing a contract would compare quotations for the same construction and weight from at least 15 to 20 manufacturers, and that he actually did buy from those 15 to 20 manufacturers at different times.

Mr. Marcus testified further that there were no restrictions in purchasing rugs for export to this country as to the prices at which they must be sold, or any other restrictions, and that he purchased what he considered to be usual wholesale quantities, ranging from

5,000 to 50,000 rugs, dependent on the grades; that the higher priced rugs would naturally be purchased in smaller quantities, and that the quantities had no effect on the price; that every manufacturer quoted on that basis, and that it was understood that would be on that minimum (R. 22/24). Also that when they had qualities that were receiving popular favor he very often purchased the identical same quality from a half dozen manufacturers in order to obtain the quantities he wanted, and that the prices would be the same. That the price was based upon weight per square meter, and that they would specify the percentage of jute, type of cotton, and then the weight, and the price would invariably be the same from the different manufacturers. Also that the prices on the invoices received were the same as the price at which ordered. The witness stated that every once in a while he would be able to make purchases slightly below the market from certain manufacturers in order to keep their plants running, and in making those entries he added such difference to make market value (R. 27, 28).

Mr. Marcus also stated that he was familiar with the fluctuations in the freely offered prices for export to this country between 1938 to 1940; that he remembered very distinctly that during that period there were not many fluctuations, and whatever there were were downward. That it would generally take 90 to 150 days to complete and ship an order, and that during 1938, if there was any fluctuation in price, it was definitely downward. That this was because there was a softening in the prices of cotton and jute, which naturally lowered the cost of production; that due to the excessive competition there was a sudden deterioration in standard of quality, and the constructions became poorer all the time, and that there was also a difference in the methods of construction, all of which lowered the cost of production (R. 29, 30). The witness stated further that the principal export markets for the rugs in question were St. Nicholas and Courtrai, around which the different manufacturers were located, and that Brussels and Antwerp were the principal markets of Belgium for rugs for home consumption, where the wholesalers were located. The witness also stated that he kept graphs or charts from 1935 showing the rise and fall of prices, and, although there was not a straight continuous descent, the line descended constantly from 1935 until late in August 1939, when on account of the war prices started to go up (R. 31, 32). That he commenced importations of these rugs in 1926, and his experience with the Stephen Rug Mills, the plaintiff herein, started in 1935. That he obtained his knowledge of the character of the rugs sold in the home market by visiting department stores and wholesalers not less than six times annually from 1926 onwards. That the entered prices of the involved merchandise were based on freely

offered prices in the ordinary course of trade and in the usual wholesale quantities for this class of rugs for export to the United States.

On cross-examination, Mr. Marcus stated that, while he devoted the principal portion of his time during 1938 and 1939 to the purchasing and styling of all the merchandise imported by his firm, some of the styling was done for him by artists, but under his supervision; that he would indicate to the artists the types and colors he wanted, and in placing orders would decide which designs to put in, and into which qualities.

X Q. So you took the colors in the design, and asked the manufacturer for a 1500 gram per square meter rug, is that right? Just answer my question.

A. That is only partially right.

X Q. Let me follow it up. You went to the manufacturer and you gave him this design and asked him to make up a 1500 grams per square meter rug?

&ast; &ast; &ast; &ast; &ast; &ast; &ast;

A. That was the second step.

X Q. What was the first step? A. The first step was to contract for the quantity and quality at the price.

X Q. Then you had a regular contract with the mill?

A. That is correct, of the design.

X Q. Have you got that contract with you?

A. I haven't got it with me in my pocket.

X Q. Have you it at your place of business?

A. Undoubtedly some of the latest contracts we have purchased.

At this point counsel for the Government moved to strike out all the witness' testimony as to the contents of the orders and specifications on the ground they were in writing and in the possession of the importer, and not produced at the trial; that such reports are part of the plaintiff's case in chief, and that it is not necessary that the Government ask him to produce these documents.

The motion of the Government was however overruled, but the witness stated he would be glad to produce the orders if wanted (R. 39/41).

The witness then continued to testify that designs have nothing to do with the price or quality; that he often would buy 100,000 square meters, designs and colors to be specified later; that the price of the rugs was based solely on the weight and quality of the materials therein—principally the cotton; that there are hundreds of qualities of cotton, but that he concentrated mainly on cotton containing about 80 per centum Indian cotton which is an inferior cotton, and 20 per centum American cotton (R. 41/44). Also that when he went to the department stores and factories in Belgium he saw rugs that went to France and England, and examined them frequently, and that in general such rugs were superior to what he bought for export to the United States, and were the same as those sold for the home market in Belgium. Further, that he bought about one million rugs during

1938 imported into the United States, and that they varied in weight from perhaps 1,350 up to 2,200 grams; that he would contract for 100,000 meters weighing so many grams and at so much per square meter, the patterns and designs to be specified later.

The witness stated further that the type of Belgian designs popular in the Belgian and continental markets are so-called medallion designs, medallion centers, whereas the type of Belgian designs salable at this date are the so-called "all over" designs (R. 56); that 5,000 to 50,000 units constitute a regular wholesale quantity; that the invoice quantity does not represent a contract, but only a segment of a contract, and that 50 invoices may represent a contract.

Counsel for the Government then stated that he would like to reserve the balance of his cross-examination of this witness until he produces the invoices at the next hearing (R. 64). It might here be mentioned, however, that when the case was later resumed and the witness appeared for further cross-examination, Government counsel asked him no questions as to his orders. The witness' testimony as to the usual wholesale quantity of the imported rugs in the principal Belgian export markets therefore stands uncontradicted, and his cross-examination in no way weakened his testimony on direct examination.

The second witness for the plaintiff was Milton Linn, who testified that he is President of Weil Brothers Textiles, Inc., and has been since 1935; that he was connected with the company in various capacities since 1924; that they are principally importers of textiles, including cotton rugs, and have been since 1925; that he has been buying rugs for the firm since 1930, and was in Belgium in 1938 to 1940 for the purpose of buying cotton rugs; that he is familiar with the cotton rugs imported from Belgium by the Stephen Rug Mills, and has been importing the same line of rugs as the Stephen Rug Mills since about 1935, and that Weil Brothers are one of the largest importers and dealers in Belgian rugs; that he had been directly responsible for the buying, selling and handling of cotton rugs imported from Belgium since 1930; that he was in Belgium for that purpose in 1938 through 1940 (R. 65/8); that he was familiar with the cotton rugs imported from there by the Stephen Rug Mills, and that his company imports the same line of merchandise.

I hardly think it necessary to go into all the details of the procedure Mr. Linn followed in his trips to Belgium in his investigation of the price and quality of cotton rugs in the Belgian markets, the cost of the raw materials entering therein, and of market conditions generally, for the purpose of buying cheap cotton rugs in Belgium for export to the United States. Suffice it to say that on the whole Mr. Linn's testimony entirely corroborates that of Mr. Marcus in all respects, and is even more detailed in some respects.

For instance, in regard to the difference in the quality and construction of the cotton rugs sold in Belgium for home consumption and those sold for export, the witness testified that the Belgian quality rug of the 1,500 gram weight for home consumption would normally contain between 70 to 80 per centum of cotton and the balance jute, and would have "more picks, more pile picks per inch than the rugs we exported to the United States," and that to equalize that weight they would use more jute filler in the export rug. "As an example of that, the generally accepted filler for the Belgium market was singles jute in a thread to hold the same weight, we would get a double jute, and use twice the amount of jute."

The same witness further stated that there was a difference in the finishing work or frilling of the respective rugs; that the Belgian home market rug would have a one-half inch frilling, and in the export rug that would be reduced to one-quarter of an inch, "and space our frilling from probably 20 picks, 20 stitches, 20 frilling stitches to the inch, may be down to ten" in the export rug (R. 77, 78).

The witness stated further that the usual wholesale quantities that the Weil Brothers company purchased were from 5,000 to 50,000 meters or pieces, sometimes even greater quantities, and that most importers did the same, and that he knows that from seeing a lot of contracts by the manufacturers with other importers (R. 83). Further, that the principal markets for exportation to the United States were the Courtrai and St. Nicholas areas; that there were no restrictions in Belgium upon the purchase of such rugs for exportation to the United States, and that the quantities of rugs purchased did not affect the prices (R. 85).

Upon the conclusion of the plaintiff's case counsel for the defendant moved for the dismissal of these reappraisement appeals on the ground that the importer failed to make out a *prima facie* case, and also failed to show all the elements necessary to make out such a case, which motion was taken under advisement (R. 127).

Upon full consideration such motion is now hereby denied, with an exception to the defendant.

The only evidence offered by the defendant in support of the appraised values herein were reports, or copies of reports, of Treasury representative, Charles Schlager, which were received and marked in evidence as follows:

Paris report 307/435, dated Sept. 28, 1938, Exhibit 1
 do 307/312 " " 6, " " 2
 do 307/328 " " 6, " " 3
 do 307/322 " " 6, " " 4
 do 307/304 " " 6, " Coll. Ex. 5
 307/311
 307/317

As to these reports, they clearly show that the tax of 2½ per centum added by the appraiser to the appraised values does not apply to the rugs sold for export, and that the rugs sold for export were freely offered for sale. Some of the reports show certain sales of rugs in the home market, running from 15 to 100 rugs, but without showing whether the rugs mentioned are of the same quality as those exported, or whether the sales were intended to represent usual wholesale quantities. Said Paris report 307/312 admits that the manufacturers De Jaegher & Fils manufactured rugs 1,500 and 1,650 grams per square meter, and that these rugs are not sold or offered for sale in the Belgian market for home consumption, but are freely offered and sold to buyers for export to other countries. In Paris report 307/328 it is admitted that only job lots of the 1,500 gram rugs manufactured by Algemeene Fluweelweverij, Courtrai, are sold in the home market, but are however freely sold to customers for export. Paris report 307/435 shows that of the five firms listed as manufacturers of 1,250 gram rugs, "No sales" are reported under the heading "Foreign value" as to four of them. And while the same report lists about 13 manufacturers of 1,450 to 1,500 gram rugs, under the head of "Foreign value" it reports "No sale" as to two of the manufacturers, and, while it gives a value as to six others, it states "to other foreign countries." The same report lists the names of two manufacturers of 1,650 gram rugs, as to one of which, under the head of "Foreign value," it reports "No sales." A price is given of the other, with the notation "to other foreign countries." There is nothing in the report to indicate when these prices took effect, or whether any sales were actually made and shipped. The report also states that the low prices quoted by the Belgian manufacturers are due to the drop in raw materials and cut-throat competition, as testified by plaintiff's witnesses.

Counsel for the plaintiff further points out in his brief that the merchandise covered by these reappraisements was entered between August 1938 and November 1938, while the said special agent's reports endeavor to quote sales or prices between July 1937 and July 1938, and hence are not competent evidence as to market values of merchandise shipped after July 1938.

So far as I can see from a perusal of said Treasury representative's reports, there is not much in them to overcome or contradict the testimony of plaintiff's two witnesses, who testified of their own intimate knowledge of the many varying differences in the qualities, character, and construction of the cotton rugs manufactured in Belgium for home consumption and those sold for export to the United States in the same weights per square meter, also as to the market prices and conditions prevailing during the period of these importations, as well as to the usual wholesale quantities, etc.

Therefore, on the basis of the record before me, I find as matters of fact:

1. That the merchandise in question consists of cotton rugs in part of jute imported from Belgium during and between August and November 1938.

2. That there was no foreign value, as such value is defined in section 402 (c) of the Tariff Act of 1930, for such or similar merchandise. Note *United States* v. *Kraft Phenix Cheese Corp.*, 26 C. C. P. A. 224, C. A. D. 21, and cases therein cited.

3. That the proper basis of appraisement for said merchandise is export value, as such value is defined in section 402 (d) of said act.

4. That said merchandise was at the times of exportation thereof sold and freely offered for sale in Belgium to all purchasers in the ordinary course of trade, in the usual wholesale quantities of 5,000 to 50,000 square meters or units, in the principal markets of Belgium, for exportation to the United States at the entered values thereof.

5. That the proper dutiable export values of said merchandise are the values set forth in finding of fact 4.

I therefore hold as matter of law that the proper basis for appraisement of the cotton rugs covered by the appeals for reappraisement in question is export value, as such value is defined in section 402 (d) of the Tariff Act of 1930; and that such export values are the entered values.

Judgment will be rendered accordingly.